**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § § § § | **COMPLAINT FOR FORFEITURE *IN REM*** |
| **v.** | § § | |
| **APPROXIMATELY 284,903.78 USDT** | § § § § | *CIVIL ACTION NO.* 26-cv-2541 |
| **Defendant, *in rem.*** | § | |

**VERIFIED COMPLAINT FOR FORFEITURE *IN REM***

Plaintiff, the United States of America, through the U.S. Attorney for the District of Columbia, brings this verified complaint for forfeiture in a civil action *in rem* against 284,903.78 USDT, hereinafter referred to as "**Defendant Property**", and alleges as follows:

**STATEMENT OF THE CASE**

1. Criminals believed to be located abroad, their associates, and conspirators together stole funds from a known victim. The funds were then laundered through a series of virtual currency addresses, and sometimes virtual currency exchanges, to evade detection and hide the origin of the funds. The **Defendant Property** constitutes proceeds traceable to those thefts and property involved in, and traceable to, this money laundering scheme.

2. The United States of America seeks to lawfully forfeit the **Defendant Property** to punish and deter criminal activity by depriving criminals of property used in or acquired through illegal activities, and most importantly, to recover assets that may be used to compensate the victim.[1]

**JURISDICTION AND VENUE**

---

[1] *See* United States Asset Forfeiture Program, *Our Mission*, https://www.justice.gov/afp.

3.      This Court has original jurisdiction of this civil action by virtue of 28 U.S.C. § 1345 because it has been commenced by the United States and by virtue of 28 U.S.C. § 1355(a) because it is an action for the recovery and enforcement of a forfeiture under an Act of Congress.

4.      This Court has *in rem* jurisdiction over the Defendant Property under 28 U.S.C. § 1355(b).

5.      Venue is proper in this judicial district under 28 U.S.C. § 1355(b)(2) because the property is subject to forfeiture under the laws of the United States and is controlled by Tether International S.A. de C.V. ("Tether"), which is domiciled in the country of El Salvador.

## NATURE OF THE ACTION AND STATURY BASIS FOR FORFEITURE

6.      The United States files this *in rem* forfeiture action to seek forfeiture of **Defendant Property** as constituting proceeds of wire fraud and wire fraud conspiracy offenses, committed in violation of 18 U.S.C. §§ 1343, 1349, 2, and 3, and as involved in money laundering and money laundering offenses, committed in violation of 18 U.S.C. 1956(a)(1)(B)(i), 1956(h), 2, and 3.

7.      Procedures for this action are mandated by Rule G of the supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions and, to the extent applicable, 18 U.S.C. §§ 981 and 983 and the Federal Rules of Civil Procedure.

8.      18 U.S.C. § 981(a)(1)(A) mandates forfeiture of any property, real or personal, involved in a transaction or attempted transaction in violation of section 18 U.S.C. §§ 1956, 1957 or 1960, or any property traceable to such property.

9.      18 U.S.C. § 981(a)(1)(C) mandates forfeiture of property constituting or derived from proceeds traceable to wire fraud, conspiracy to commit wire fraud, or any offense constituting "specified unlawful activity" as defined by 18 U.S.C. § 1956(c)(7), or a conspiracy to commit such offense. A violation of 18 U.S.C. § 1343, or a conspiracy to commit that offense, constitutes

specified unlawful activity under 18 U.S.C. § 1956(c)(7)(A) as an offense listed in 18 U.S.C. § 1961(1)(B).

10.     18 U.S.C. § 1343 provides that whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, commits the violation of wire fraud.

11.     18 U.S.C. § 1349 provides that whoever attempts or conspires to commit a violation of 18 U.S.C. § 1343 shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy.

12.     18 U.S.C. § 1956(a)(1)(B)(i) provides in relevant part that whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity— . . . knowing that the transaction is designed in whole or in part . . . to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity" is guilty of concealment of money laundering.

13.     18 U.S.C. § 1956(a)(2)(B)(i) provides that whoever transports, transmits, or transfers, or attempts to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States—knowing that the monetary instrument or funds involved in the transportation, transmission, or transfer represent the proceeds of some form of unlawful activity and knowing that such transportation, transmission, or transfer is designed in

whole or in part—to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity, commits international money laundering.

14.     18 U.S.C. § 1956(h) provides that any person who conspires to commit any offense of 1956 or 1957 is subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy.

## PROPERTY INFORMATION

15.     The **Defendant Property** is 284,903.78 USDT, which is the equivalent to approximately $284,654.67 in U.S. dollars (USD).  The **Defendant Property** is associated with virtual currency addresses:

a. 0xc55fd9acf6cc5abdaa087380a18586cf2d98d7d1 ("**Subject Virtual Currency Address 1**"), which holds approximately 24,740.04 USDT, and

b. 0x07e9ba18c6d487c2c713fe99fa23a0997fb2db3a ("**Subject Virtual Currency Address 2**"), which holds approximately 260,163.74 USDT (collectively, the "Subject Virtual Currency Addresses").

16.     The virtual currency associated with the Subject Virtual Currency Addresses is hereinafter referred to as the "**Defendant Property**." The United States has yet to take custody and control over the **Defendant Property**, which is held, and was voluntarily frozen by, Tether.

**DEFINITIONS**

17.     **Virtual Currency:** Virtual currencies are digital representations of value that, like traditional coin and paper currency, function as a medium of exchange (i.e., they can be digitally traded or transferred, and can be used for payment or investment purposes). Virtual currencies are a type of digital asset separate and distinct from digital representations of traditional currencies, securities, and other traditional financial assets. The exchange value of a particular virtual currency generally is based on agreement or trust among its community of users. Some virtual currencies have equivalent values in real currency or can act as a substitute for real currency, while others are specific to particular virtual domains (e.g., online gaming communities) and generally cannot be exchanged for real currency. Cryptocurrencies, like Bitcoin and Ether, are types of virtual currencies, which rely on cryptography for security. Cryptocurrencies typically lack a central administrator to issue the currency and maintain payment ledgers. Instead, cryptocurrencies use algorithms, a distributed ledger known as a blockchain, and a network of peer-to-peer users to maintain an accurate system of payments and receipts.

18.     **Blockchain:** A blockchain is a digital ledger run by a decentralized network of computers referred to as "nodes." Each node runs software that maintains an immutable and historical record of every transaction utilizing that blockchain's technology. Many digital assets, including virtual currencies, publicly record all their transactions on a blockchain, including all of the known balances for each virtual currency address on the blockchain. Blockchains consist of blocks of cryptographically signed transactions, and blocks are added to the previous block after validation and after undergoing a consensus decision to expose and resist tampering or manipulation of the data. There are many different blockchains used by many different virtual

currencies. For example, Bitcoin in its native state exists of the Bitcoin blockchain, while Ether (or "ETH") exists in its native state on the Ethereum network.

19. **Blockchain Analysis:** Law enforcement can trace transactions on blockchains to determine which virtual currency addresses are sending and receiving particular virtual currency. This analysis can be invaluable to criminal investigations for many reasons, including that it may enable law enforcement to uncover transactions involving illicit funds and to identify the person(s) behind those transactions. To conduct blockchain analysis, law enforcement officers use reputable, free open source blockchain explorers, as well as commercial tools and services. These commercial tools are offered by different blockchain-analysis companies. Through numerous unrelated investigations, law enforcement has found the information associated with these tools to be reliable.

20. **Virtual Currency Address:** A virtual currency address is an alphanumeric string that designates the virtual location on a blockchain where virtual currency can be sent and received. A virtual currency address is associated with a virtual currency wallet.

21. **Virtual Currency Exchange:** A virtual currency exchange ("VCE"), also called a virtual currency exchange, is a platform used to buy and sell virtual currencies. VCEs allow users to exchange their virtual currency for other virtual currencies or fiat currency, and vice versa. Many VCEs also store their customers' virtual currency addresses in hosted wallets. VCEs can be centralized (i.e., an entity or organization that facilitates virtual currency trading between parties on a large scale and often resembles traditional asset exchanges like the exchange of stocks) or decentralized (i.e., a peer-to-peer marketplace where transactions occur directly between parties).

22. **Virtual Currency Wallet:** A virtual currency wallet (*e.g.,* a hardware wallet, software wallet, or paper wallet) stores a user's public and private keys, allowing a user to send

and receive virtual currency stored on the blockchain. Multiple virtual currency addresses can be controlled by one wallet.

23.     **Unhosted Wallet:** An unhosted wallet, also known as a self-hosted, non-custodial wallet, is a virtual currency wallet through which the user has complete control over storing and securing their private keys and virtual currency. Unhosted wallets do not require a third party's involvement (*e.g.,* a virtual currency exchange) to facilitate a transaction involving the wallet. Unhosted wallets allow users to generate and manage their own unhosted wallet addresses.

24.     **Transaction Fee:** A transaction fee is a fee paid by the party sending virtual currency on a blockchain to reward miners and/or validators for verifying and validating transactions. Transaction fees vary by blockchain and can fluctuate based on factors such as blockchain network traffic and transaction sizes. Senders of virtual currency can increase the transaction fees that they pay to have their transactions confirmed faster by miners and/or validators. Transaction fees are generally paid in a blockchain's native token (*e.g.*, Bitcoin on the Bitcoin blockchain). On the Ethereum network, these transaction fees are called "gas fees." Gas fees are transaction costs paid in Ether ("ETH"), or its fraction, gwei. These fees serve as a form of remuneration for validators who maintain and secure the network. Gas fees fluctuate based on supply, demand, and network capacity, and may increase during periods of network congestion.

25.     **Stablecoins:** Stablecoins are a type of virtual currency whose value is pegged to a commodity's price, such as gold, or to a fiat currency, such as the U.S. dollar, or to a different virtual currency. For example, Tether (also known as USDT) is a stablecoin pegged to the U.S. dollar. Stablecoins achieve their price stability via collateralization (backing) or through algorithmic mechanisms of buying and selling the reference asset or its derivatives.

26.    **Tether:** Tether International S.A. de C.V. ("Tether") is the company that manages the smart contracts and the treasury (i.e., the funds held in reserve) for USDT tokens.

27.    **Ether:** Ether ("ETH") is a virtual currency that is the native token used by the Ethereum blockchain, which is a blockchain with smart contract functionality.

## STATEMENT OF FACTS

### Background on Cryptocurrency Investment Fraud

28.    The USSS is investigating cryptocurrency investment fraud ("CIF") schemes, often referred to as "pig-butchering," a term derived from the Chinese-language word used to describe this scheme and its treatment of victims. In 2024 alone, more than 41,000 complaints of CIF were received by the FBI's Internet Crime Complaint Center (IC3), resulting in $5.8 billion in reported losses.[2] CIF schemes are often orchestrated by Asia-based criminal syndicates, predominately operating in southeast Asia.

29.    In CIF schemes, criminals contact potential victims through seemingly misdirected text messages, dating applications, or other online platforms/forums with the goal of building rapport and relationships with the victims.

30.    Once that trust is established, the criminal recommends virtual currency investment by touting their own, or an associate's success in the field. Investment methods vary, but a common tactic is to direct a victim to a fake investment platform hosted on a website. These websites, and the investment platforms hosted there, are created by criminals to mimic legitimate platforms. The subject usually instructs and/or assists the victim with opening an account on a centralized virtual currency exchange, such as Coinbase or Crypto.com, and then walks the victim through

---

[2] *See* Fed. Bureau of Investigation, Internet Crime Report 2024 at 36, https://www.ic3.gov/AnnualReport/Reports/2024_IC3Report.pdf.

transferring money from a bank account to that virtual currency exchange account. Next, the victim will usually receive instructions on how to transfer their virtual currency assets to the fake investment platform. On its surface, the platform typically shows lucrative returns, encouraging further investment. However, all deposited funds are actually routed to a virtual currency address controlled by the criminals.

31.     In CIF schemes, the subjects will continue to encourage investments until victims have depleted their savings. Oftentimes, the subject will attempt to continue the scheme by coaching victims on taking out loans against their homes or borrowing money from friends and family. Inevitably, these victims generally run out of money and make attempts to withdraw their funds. However, victims are unable to do so and are provided various excuses as to why. For example, subjects will often levy a fake "tax" requirement, stating taxes must be paid on the proceeds generated from the platform. This is just an eleventh-hour effort by subjects to elicit more money from victims; ultimately, victims are locked out of their accounts and lose all their funds. Even when victims procure enough funds to pay these "taxes," the subjects will continue to concoct new excuses and fees for victims to pay.

**Overarching CIF Investigation Involving the SUBJECT VIRTUAL CURRENCY ADDRESSES**

32.     On or about January 2026, USSS WFO investigators were contacted about an ongoing cryptocurrency confidence scam being worked by the United Kingdom ("UK") law enforcement agency, the NCA.

33.     NCA reported that a known victim ("**Victim-1**") was initially contacted in 2023 regarding a fraudulent investment opportunity by a fictitious company using the name Apex Financial. In communication with subjects using the names David Hill and Grant Ford, **Victim-1** transferred over 2 million GBP to "invest" with Apex Financial.  Following this initial

investment, **Victim-1** was told his investments were now up to 12 million GBP but could not be withdrawn until certain fees were paid. Based on my training and experience, I know that perpetrators of cryptocurrency investment scams orchestrate fake investment gains to strengthen their trust in the platform's profit potential. Victims are also advised that they can retrieve their earnings off the platform following fees or taxes, a tactic commonly used by perpetrators of investment scams to defraud the victims of additional funds. Directed by the scammers, **Victim-1** proceeded to pay approximately 1.7 million GBP more into the scheme in his attempts to withdraw his "earnings".

34.    **Victim-1** reported that he realized he was a victim of fraud sometime in 2023 and began an effort to recover his funds. In this process, **Victim-1** was contacted by an individual claiming to be a high-ranking member of the National Crime Agency and subjects impersonating the legitimate cryptocurrency recovery service CatLabs and its employees, including a US citizen (collectively, the "**Subjects**"). Investigators also identified at least one other victim ("**Victim-2**") who was contacted using the same fraudulent CatLabs email address. **Victim-2** reported a loss of 12 thousand GBP.

35.    The **Subjects** told **Victim-1** that his funds from the original hack were recovered and transferred to his Wise[3] account the victim set up following instructions from the subjects, but that it would stay frozen by the NCA and the UK agency His Majesty's Revenue and Customs ("HMRC") until he settled a tax liability. He was also provided with fictitious emails appearing to be from HMRC, urging **Victim-1** to continue paying fees and taxes to release his funds. Exhibit 1.

---

[3] British global money transfer service headquartered in London, UK.

10

**Exhibit 1 – Email from Subjects Impersonating HMBC**

---------- Original Message ----------
From: HMRC <compliance@gov.uk>
To: johnhays <johnhays@catlabs.us>
Date: 11/18/2025 08:32 AM EST
Subject: Updated Position Regarding Release Undertaking – Mr. Sherif Raafat (P33642145)

Dear Mr. Hays,

HM Revenue & Customs writes to inform you that, following the most recent review cycle undertaken with our international partners, the prior **Conditional Release Undertaking** has been **formally withdrawn**. This decision has been made in light of new information received during the ongoing compliance investigation relating to Mr. Sherif Raafat.

1. Basis for Withdrawal of the Previous Agreement

The prior contract, which allowed for partial provisional payment and deduction of the remaining liability from the frozen Wise balance, was predicated assuming that no further material risk factors would emerge.

Subsequent forensic review identified:

- Multiple transfers from the client's Revolut accounts to externally controlled high-risk wallets.
- International wire transfers associated with entities reported for fraud exposure.
- Evidence of repeated dealings with unregulated brokers, unlicensed intermediaries, and fraudulent actors across several jurisdictions.
- Indicators of malware-related asset diversion and compromised devices.
- A pattern of transactions consistent with high-risk victim behavior requiring escalation under HMRC and IRS joint-risk protocols.

This body of information materially altered the assessed risk classification of the case.

2. Why the Remaining 50% Tax Cannot Be Deducted From the Frozen Balance

Both HMRC and the United States Internal Revenue Service have jointly determined that **the remaining tax liability must be settled using external, cleared funds**. Deduction from the frozen Wise balance is no longer permitted.

36.    Under belief that he was paying fees to release his frozen funds that were recovered by CatLabs, NCA, and HMRC, he made a series of transactions between October 2025 to January 2026, totaling approximately 3,198,698 USDT, from Coinbase into addresses 0x3ad213291b17214af2c32ab292436b00ba79bbfd ("0x3ad2") and address 0x2bb3e97889a099452662fdd8e7920f5c6867ebf4. These transactions include, but are not limited to, the following into 0x3ad2, totaling approximately 1,601,871 USDT:

| Date | USDT Amount | USD Amount |
|---|---|---|
| 1/14/2026 | 4701.716 | $ 4,701.74 |
| 1/13/2026 | 6706.539 | $ 6,703.24 |
| 1/12/2026 | 238.285 | $ 238.04 |
| 1/12/2026 | 6507.777 | $ 6,501.11 |
| 1/12/2026 | 6737.321 | $ 6,730.42 |
| 1/6/2026 | 160048.800 | $ 159,990.38 |
| 1/6/2026 | 290102.987 | $ 289,997.10 |

11

| 1/6/2026 | 300108.039 | $ 299,998.50 |
|----------|------------|--------------|
| 1/6/2026 | 250088.782 | $ 249,997.50 |
| 1/6/2026 | 200061.019 | $ 199,988.00 |
| 1/6/2026 | 76023.187 | $ 75,995.44 |
| 1/6/2026 | 100.029 | $ 99.99 |
| 12/30/2025 | 195224.508 | $ 195,039.83 |
| 12/30/2025 | 55063.874 | $ 55,011.78 |
| 12/30/2025 | 50058.318 | $ 50,010.96 |
| 12/30/2025 | 100.116 | $ 100.02 |

37.    Using the Last in First Out ("LIFO") method, most of these funds were traced to several cryptocurrency Virtual Asset Service Providers ("VASPs"). Some of the funds (the **Defendant Property**) were traced to the un-hosted **Subject Virtual Currency Addresses,** and voluntarily blocklisted by Tether.

38.    Because the USDT in 0x3ad2 was funded almost solely by **Victim-1**'s Coinbase transactions as part of the scam, all outgoing USDT transfers from this address can be attributed to **Victim-1**.[4] Specifically, seven of the previously listed victim transactions, in whole or in part, fund the **Defendant Property** contained in the **Subject Virtual Currency Addresses**. A summary of this flow is shown in Exhibit 2 and further explained below.

---

[4] 0x3ad2 had an incoming volume of $1,601,542 during the relevant period, between December 30, 2025 and January 14, 2026, of which, approximately $1,601,508 was received from **Victim-1**'s Coinbase account.

**Exhibit 2 – Flow of Victim Funds to the Subject Virtual Currency Addresses**



**Subject Virtual Currency Address 1**

39.    Investigators contacted Tether to freeze the USDT contained in **Subject Virtual Currency Address 1** upon tracing victim funds to the address. As recently as May 2026, following the freeze, investigators have confirmed using opensource blockchain explorer Etherscan.io that approximately 24,740.04 USDT remains in **Subject Virtual Currency Address 1** and comprises the entirety of the USDT balance of the address.

40.    Two victim transactions, in whole or in part, fund the **Defendant Property** contained in **Subject Virtual Currency Address 1**. These transactions, shown below, were all initiated by Victim-1 through his Coinbase account as part of the scheme and as directed by the **Subjects.**

| Transaction | Date | USDT Amount | USD Amount |
|---|---|---|---|
| **Victim Transaction 1** | 12/30/2025 | 55063.87409 | $          55,011.78 |
| **Victim Transaction 2** | 12/30/2025 | 195224.5082 | $        195,039.83 |

41.    The USDT balance of 0x3ad2 prior to **Victim Transaction 1**[5] was approximately 50158.43 USDT, but as explained previously, this balance is made up of other transactions that are also attributable to **Victim-1**. **Victim Transaction 2**[6] occurred right after **Victim Transaction 1** with no other inflows or outflows between the two transactions. By LIFO, all of **Victim Transaction 2** and about 4775.29 USDT of **Victim Transaction 1**, funded a 200,000 USDT transfer[7] to 0x2548553f62b57fc4d00ec348ceeacd500c4c122c ("0x2548"), made up entirely of **Victim-1**'s funds. There were no other USDT inflows or outflows between this transaction and the deposit of **Victim Transaction 2**.

42.    The USDT balance of 0x2548 prior to this transfer of 200,000 USDT was 0. Before any other deposits came into 0x2548, 173,900 USDT, funded entirely by **Victim-1**'s funds, was transferred out to 0x674ad4750c6c131b222fa747e3868dcc375a1da7 ("0x674a"). The balance of 0x674a prior to this transfer was 100 USDT, also from 0x2548 and funded by **Victim-1**. The next transaction made through 0x674a was a transfer of 88,150 USDT into **Subject Virtual Currency Address 1**. This transfer into **Subject Virtual Currency Address 1** was, thus, made up entirely of **Victim-1**'s funds.

43.    The USDT balance of **Subject Virtual Currency Address 1** prior to this transfer was 90 USDT. While approximately 63,500 USDT of the 88,150 USDT was transferred out before Tether blocklisted the address, the only other inflows total approximately 0.04 USDT. Therefore, by

---

[5] Transaction hash:
0x3da59f2fa186fba53309620ef64e1e9a81aacaa5a5ae94fcd8b40d48df44242e.
[6] Transaction hash:
0x7ee5524814d2753155edb4e0df466b015bfb9b6e3416531036ffc7ba61042a6a.
[7] Transaction hash:
0x85605d3e238758eb06368f4c564aacc210ea208bc37383303eeb6832dd37809b.

LIFO, approximately 24,650 USDT of the 24,740 USDT contained in **Subject Virtual Currency Address 1** is directly traceable to **Victim-1**.

44.     This flow, from the initial victim transaction from Coinbase to the eventual deposit into **Subject Virtual Currency Address 1**, is shown below in Exhibit 3.

**Exhibit 3 – Trace of Victim-1's Funds to Subject Virtual Currency Address 1**



**Subject Virtual Currency Address 2**

45.     Investigators contacted Tether to freeze the USDT contained in **Subject Virtual Currency Address 2** upon tracing victim funds to the address. As recently as May 2026, following the freeze, investigators have confirmed using opensource blockchain explorer Etherscan.io that approximately 260,163.74 USDT remains in **Subject Virtual Currency Address 2** and comprise the entirety of the USDT balance of the address.

46.     Five victim transactions, in whole or in part, fund the **Defendant Property** contained in **Subject Virtual Currency Address 2**. These transactions, shown below, were all initiated by Victim-1 through his Coinbase account as part of the scheme and as directed by the **Subjects.**

| Transaction | Date | USDT Amount | USD Amount |
|---|---|---|---|
| **Victim Transaction 3** | 1/6/2026 | 200061.0186 | $ 199,988.00 |
| **Victim Transaction 4** | 1/6/2026 | 250088.7815 | $ 249,997.50 |
| **Victim Transaction 5** | 1/12/2026 | 6737.320591 | $ 6,730.42 |
| **Victim Transaction 6** | 1/13/2026 | 6706.538875 | $ 6,703.24 |
| **Victim Transaction 7** | 1/14/2026 | 4701.716126 | $ 4,701.74 |

47.     The USDT balance of 0x3ad2 prior to **Victim Transaction 3**[8] was approximately 76570 USDT, but as explained previously, this balance is made up of other transactions that are also attributable to **Victim-1**. **Victim Transaction 4**[9] occurred right after **Victim Transaction 3** with no other inflows or outflows between the two transactions. Following **Victim Transaction 4**, approximately 750,259.83 USDT was deposited into 0x3ad2 in three other transactions attributable to **Victim-1**. By LIFO, these deposits, as well as about 607.17 of **Victim Transaction 4**, funded the transfer of about 300,100 USDT to address 0x76ead949ddea6c327d16f6d1b53095a4edf500f0 in two transactions, 40,000 USDT to address 0x1c0762cf13f5b5f5675b228e6b109eeaf6aa5314 in two transactions, 260,667 USDT to 0xea48f8e3eed675054dc702602783ddde64881267 in two transactions, and 150,100 USDT to address 0x22cefce4424401abd52a0bf9ec06c59979b4fa3e ("0x22ce") in two transactions. The remaining 249481.6 USDT from **Victim Transaction 4** and about 618.39 USDT from **Victim Transaction 3** were used to fund the subsequent transfers of 100 USDT and 250,000 USDT to **Subject Virtual Currency Address 2.**

48.     Before **Victim Transaction 5**[10], USDT balance of 0x3ad2 was approximately 0.002 USDT. Following this deposit of approximately 6737.3 USDT, two more transactions, totaling approximately 6746 USDT and also attributed to **Victim-1**, were deposited and, by LIFO, used entirely to fund a 8076 USDT transfer out to address 0x22ce. Following this transaction, 5384 USDT was sent out to **Subject Virtual Currency Address 2**, funded completely by **Victim**

---

[8] Transaction hash:
0xfd2fb10f192f6d01f123645318c726b6ab2ecaf6a8dc199a4a7fb7f3d9caeed6.
[9] Transaction hash:
0xb2a60f5d977c87224ff10c3f6801c349bcd5e13ca5ab93f1c1c48c5f325c1f17.
[10] Transaction hash:
0x42efae31cf9190fb1ab5d66f85168443454c211c477e3dcc2dc1e791fb607e05.

**Transaction 5** and leaving a balance of approximately 23.4 USDT, also from **Victim Transaction 5**.

49.    Next USDT transaction in 0x3ad2 was the deposit of **Victim Transaction 6**.[11] This deposit, by LIFO, funded a 4037.4 USDT transaction out to 0x22ce and a 2682 USDT transaction out to **Subject Virtual Currency Address 2**[12].

50.    Next USDT transaction in 0x3ad2 was the deposit of **Victim Transaction 7**.[13] This deposit, by LIFO, funded a 2827.2 USDT transaction out to 0x22ce and a 1885 USDT transaction out to **Subject Virtual Currency Address 2**.[14]

51.    Thus, all five transactions out to **Subject Virtual Currency Address 2**, totaling approximately 260,0051.04 USDT and making up the entirety of the USDT currently stored in **Subject Virtual Currency Address 2**, were funded by **Victim Transactions 3-7** and are summarized below:

| Date | Transaction Hash | USDT |
|---|---|---|
| 1/14/2026 | 0xf6cbc46b1931cb290f719b763c953f889625f7415dbaac36a738d4200163c2da | 1885.04 |
| 1/13/2026 | 0x51c6b15887b55594d3206d9f02139198de50d204c32d5c1b9c2d4b2c376c099d | 2682 |
| 1/12/2026 | 0x9a0715186a88a8902e2e19d3ec011aae5a52bfc913374e7ca3f1de53d1f1c89e | 5384 |
| 1/6/2026 | 0x6c529d1a929317e07ccbe4a42aacb0f6d1b325ce127adfb3ca446a7fe023d908 | 250000 |
| 1/6/2026 | 0xc4e3415757377f3e698a81eb71553c362eaf6fcade368bfaa823d288ac2852ae | 100 |

52.    This flow of funds, from **Victim-1**'s Coinbase to **Subject Virtual Currency Address 2**, is displayed below in Exhibit 4.

---

[11] Transaction hash: 0x979b916f446e7a31191026bde6bb565d954612a0906015918a3d84ad9e355836.

[12] This transaction also included approximately 12.9 USDT from the 23.4 USDT remaining from **Victim Transaction 5**.

[13] Transaction hash: 0x0108a9751fa54a5b7c07f726da313f1eda98756ea27f4ed9f1e287bbcab84e6d.

[14] This transaction also included the remaining funds from **Victim Transaction 5**, approximately 10.5 USDT.

**Exhibit 4 – Trace of Victim-1's Funds to Subject Virtual Currency Address 2**



### Subject Funds' Involvement in Money Laundering Offenses

53.    As described above, one confirmed victim's funds are traceable to the entirety of the **Defendant Property**. This victim was defrauded as part of a wire fraud scheme, in violation of Title 18, United States Code, Sections 1343 and 1349, when unidentified subjects knowingly participated in a scheme to defraud him, in part by using materially false and/or fraudulent pretenses, representations, and promises that their cryptocurrency deposits were for legitimate cryptocurrency investments. These pretenses, representations, and promises were conveyed to the victims through the use of wire communications in interstate or foreign commerce—i.e., messages over various U.S.-based message applications and wireless carriers.

54.    In addition to committing these wire fraud violations, subjects and/or their co-conspirators also committed money laundering offenses. First, almost all CIF scam operations involving the solicitation and initial transfer of victim funds are believed to emanate from foreign-based individuals.[15] Therefore, the unidentified subjects are believed to have committed international concealment money laundering, in violation of Title 18, United States Code, Section

---

[15] *See e.g.,* Lily Hay Newman & Matt Burgess, *The Pig Butchering Invasion Has Begun*, WIRED (Sept. 30, 2024, 6:00 AM), https://www.wired.com/story/pig-butchering-scam-invasion/, ("Such "pig butchering" operations have largely been concentrated in Myanmar, Cambodia, and Laos, typically rooted in Chinese organized crime groups exploiting instability and poor governance in the region. . . . [P]ig butchering operations that are offshoots of the Southeast Asian activity have emerged in the Middle East, Eastern Europe, Latin America, and West Africa.").

1956(a)(2)(B)(i) by transferring funds from a place in the U.S. (victims' cryptocurrency purchased through U.S. virtual currency exchanges) to virtual currency addresses controlled outside of the U.S., knowing that the funds involved in the transfers represented wire fraud proceeds, and to conceal the nature, location, source, ownership or control of the wire fraud proceeds. Additionally, Know Your Customer information received from exchanges the rest of **Victim-1**'s funds were traced to show account owners are located outside of the U.S., including Georgia and the Republic of Armenia.

55.    Furthermore, based on analysis of the transaction activity involving the subject-controlled addresses that first received **Victim-1**'s funds, the multiple intermediary addresses that later received, commingled, or consolidated **Victim-1**'s funds, and the **Subject Virtual Currency Addresses** were used in a coordinated fashion to make transactions designed to conceal the nature, location, source, ownership, or control of wire fraud proceeds in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i). Such transaction activity, for example, is seen through the transfer of **Victim-1**'s funds from the initial deposit address controlled by the **Subjects**, through intermediary addresses, and into various exchanges and the **Subject Virtual Currency Addresses**. An example of this flow is shown below in Exhibit 5.

19

**Exhibit 5 – Transfer of Victim-1s Funds into Subject Virtual Currency Address 2 and Exchanges**



56.     Criminals will often conduct multiple otherwise unnecessary transactions in the transfer of funds, incurring transaction costs, to layer ill-gotten funds to ultimately conceal or disguise the nature, location, source, ownership, or control of those proceeds. The large number of quick transfers between these intermediary addresses is a strong indication that the movement of funds was performed in a manner meant to conceal or disguise the nature, location, source, ownership, or control of the proceeds of a specified unlawful activity (in this case, wire fraud).

57.     There is no reason, economic or otherwise, for legitimate businesses or individuals to conduct cryptocurrency transfers in the above fashion. Whether transferring Bitcoin (BTC) or USDT, each individual cryptocurrency transfer costs money. For USDT, that cost comes through the payment of transactions fees, or "gas" fees, required by the Ethereum blockchain. It is reasonable to assume that businesses and individuals would strive to minimize those fees by

conducting transfers with as few transactions, or "hops," as possible. Furthermore, each transaction delays the whole process, defeating one of the key attributes of virtual currency as a quick means of exchange.

## COUNT ONE – FORFEITURE OF DEFENDANT PROPERTY

### (18 U.S.C. § 981(a)(1)(C))

58.    The Defendant Property includes property constituting or derived from proceeds traceable to wire fraud and conspiracy to commit wire fraud, in violation of 18 U.S.C. §§ 1343 and 1349.

59.    Accordingly, the Defendant Property is subject to forfeiture to the United States under 18 U.S.C. § 981(a)(1)(C).

## COUNT TWO – FORFEITURE OF DEFENDANT PROPERTY

### (18 U.S.C. § 981(a)(1)(A))

60.    The Defendant Property constitutes property involved (a) domestic and international concealment of money laundering transactions committed in violation of Title 18, United States Code, Sections 1956(a)(1)(B)(i) and 1956(a)(2)(B)(i), (b) a conspiracy to engage in money laundering, committed in violation of Title 18, United States Code, Section 1956(h).

61.    Accordingly, the Defendant Funds are subject to forfeiture to the United States under 18 U.S.C. § 981(a)(1)(A).

## PRAYER FOR RELIEF

WHEREFORE, the United States of America prays that notice issue on the Defendant Property as described above; that due notice be given to all parties to appear and show cause why the forfeiture should not be decreed; that this Honorable Court issue a warrant of arrest *in rem* according to law; that judgment be entered declaring that the Defendant Property be forfeited to

the United States of America for disposition according to law; and that the United States of America be granted such other relief as this Court may deem just and proper.

Respectfully submitted,

JEANINE FERRIS PIRRO
United States Attorney


/s/ Rick Blaylock, Jr.
Rick Blaylock, Jr.
TX Bar No. 24103294
Assistant United States Attorney
Asset Forfeiture Coordinator
United States Attorney's Office
601 D Street, N.W.
Washington, D.C. 20001
(202) 252-6765
rick.blaylock.jr@usdoj.gov

**VERIFICATION**

I, John Schmitz, a Special Agent with the United States Secret Service, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing Verified Complaint for Forfeiture *in rem* is based upon reports and information known to me and/or furnished to me by other law enforcement representatives and that everything represented herein is true and correct.

Executed on this 20th day of July 2026.

_____
John Schmitz
   Special Agent
   United States Secret Service